IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| FRIENDS OF THE BITTERROOT; FRIENDS OF THE CLEARWATER; NATIVE ECOSYSTEMS COUNCIL; and WILDEARTH GUARDIANS,<br><br>   Plaintiffs,<br><br> vs.<br><br>DOUG BURGUM, Secretary of the Interior; BRIAN NESVIK, Director of the U.S. Fish and Wildlife Service; U.S. FISH AND WILDLIFE SERVICE; TOM SCHULTZ, Chief of the U.S. Forest Service; MATT ANDERSON, Forest Supervisor of the Bitterroot National Forest; and U.S. FOREST SERVICE,<br><br>   Defendants. | CV 24–169–M–DLC<br><br><br>OPINION<br>and ORDER |

Plaintiffs are environmental organizations challenging the 2023 Programmatic Amendment 40 to the 1987 Forest Plan for the Bitterroot National Forest ("Amendment 40" or the "Amendment"). Plaintiffs argue that the United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service ("FWS") failed to adequately address threats to grizzly bears and bull trout in violation of the Endangered Species Act ("ESA"), failed to take a "hard look" at impacts on grizzly bears and bull trout in violation of the National Environmental

1

Policy Act ("NEPA"), failed to prepare an environmental impact statement ("EIS") as required by NEPA, and failed to maintain or restore both grizzly bear and bull trout connective habitat in violation of the National Forest Management Act ("NFMA"). Fundamentally, Plaintiffs allege that Amendment 40 eliminated prior restrictions on road densities and motorized access without adequately considering the resulting impacts on grizzly bears and bull trout. In response, Defendants argue that Plaintiffs lack standing, waived and/or failed to exhaust their NEPA and NFMA claims, and that their NFMA claims are not ripe. Defendants further argue that Plaintiffs' challenges fail on the merits, asserting the sufficiency of the agencies' environmental review. The parties filed cross-motions for summary judgment, (Docs. 26, 31), and a motion hearing was held on April 23, 2026, (*see* Doc. 47). Having considered the parties' arguments and reviewed the administrative record, the cross-motions for summary judgment are granted in part and denied in part as outlined below.

**BACKGROUND**

## I.      The Grizzly Bear

The grizzly bear once numbered an estimated 50,000 individuals throughout much of the western half of the contiguous United States. FS049839. However, with European settlement of the American West in the late 1800s, "grizzly bears were shot, poisoned, and trapped wherever they were found," resulting in dramatic

2

declines in range and population. FS049885. By the 1930s, "[g]rizzly bears were reduced to close to 2 percent of their former range in the lower-48 States." FS049885. By 1975, the estimated population in the lower-48 States was between 700 and 800 animals. FS049886.

In 1975, the FWS listed all grizzly bears in the lower-48 United States as threatened species under the ESA. Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31,734, 31,734–36 (July 28, 1975). The FWS determined that grizzly bears in the contiguous United States were threatened by a combination of factors, including destruction of habitat from road construction. *Id.* The FWS further determined that grizzly bears in the contiguous United States had lost habitat and habitat connectivity, which isolated existing populations from one another. *Id.*

In 1993, the FWS designated the following six recovery areas in the contiguous United States where grizzly bears are known to have inhabited and where suitable habitat for grizzly bear conservation still remains: (1) the Northern Continental Divide Ecosystem ("NCDE"); (2) the Greater Yellowstone Ecosystem; (3) the Cabinet-Yaak Ecosystem; (4) the Selkirk Mountains Ecosystem; (5) the Bitterroot Ecosystem; and (6) the North Cascades Ecosystem. FS049870–71. The Bitterroot Ecosystem "was home to widespread grizzly populations until the middle of the 20th century when evidence of the bear's last sign was found." *All.*

3

*for the Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1030 (D. Mont. 2023). "Of all remaining unoccupied grizzly bear habitat in the lower 48 states, [the Bitterroot Ecosystem] affords one of the best possibilities for grizzly bear recovery." FS035445. "While reoccurring grizzly bear use does not occur in the [Bitterroot] at this time," FWS000009, multiple grizzly bears have been confirmed in the area since 2007, FS049904; *see* FWS000009 (describing specific verified sightings).

"Motorized access has long been recognized as a major factor affecting grizzly bears." FWS000010. "[G]rizzly bears adjust their habitat use patterns in part" based on the density of roads in an area. FWS004449. Grizzly bears "[a]re consistently displaced from roads and habitat surrounding roads, often despite relatively low levels of human use." FWS000031. While "[r]esearch suggests that grizzly bears benefit from road closures," "[s]ome grizzly bears avoided areas with a high total road density even when the roads were closed to public travel." FWS000032. Consistently, "secure habitat" for grizzly bears is defined in terms of areas more than 500 meters from motorized roads or trails. FWS000013; FS009515. The requisite size of those areas is directly in dispute here. *See* FWS00013 ("U.S. based grizzly bear researchers agree there is currently no single scientifically supported secure habitat benchmark that demarks adverse impacts to individual grizzly bears in all situations outside recovery zones."). Studies demonstrate that female grizzly bears survive better in areas with greater secure

4

habitat. FWS000151; FWS000201. Research in the NCDE[1] showed greater use in patches of secure habitat larger than 2,500 acres in size. FWS000014. Proctor et al.'s 2019 literature review concluded that secure habitat patches should be at least ten square kilometers (2,471 acres). FS045061. Gibeau et al. calculated a minimum requirement of nine square kilometers (2,224 acres) based on average daily foraging radius. FS036050. Wakkinen and Kasworm suggested that if a minimum size exists, patches of secure habitat should be between two square miles (1,280 acres) and 8 square miles (5,120 acres). FWS003965. Wakkinen and Kasworm further warned that "narrow strips of core habitat that may fit some minimum size criteria likely will not provide effective core habitat for bears." FWS003965. Consistently, the FWS recognizes that "larger, less fragmented patches of secure habitat are likely the ideal for a grizzly bear, and better support daily use." FWS000013.

## II.   Bull Trout

Bull trout are a highly migratory char in the salmonidae family. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for Bull Trout in the Coterminous United States, 75 Fed. Reg. 63,898, 63,898, 63,910 (Oct. 18, 2010). Historically, bull trout were more widespread than they are now;

---

[1] Both the Cabinet-Yaak and Selkirk Recovery Zones do not have a minimum patch size and the Greater Yellowstone currently has a patch size of 10 acres. *See* FWS000014.

however, the distribution of populations is now "scattered and patchy." *Id.* at 63,898.

In 1999, the FWS listed bull trout in the lower-48 states as a threatened species under the ESA. Determination of Threatened Status for Bull Trout in the Coterminous United States, 64 Fed. Reg. 58,910 (Nov. 1, 1999). In 2010, the FWS designated critical habitat for bull trout under the ESA, including many creeks and watersheds within and downstream from the Bitterroot National Forest. 75 Fed. Reg. at 63,942. This critical habitat includes the following drainages: East Fork Bitterroot River and larger tributaries above the Jennings Campground; West Fork Bitterroot River and tributaries above Painted Rocks Dam; Selway River and larger tributaries; Skalkaho Creek; Burnt Fork; Warm Springs Creek; Tolan Creek; Boulder Creek; the upper Nez Perce Fork and larger tributaries; Tin Cup Creek; Blodgett Creek; Sleeping Child Creek; Fred Burr Creek; and Lost Horse Creek. FS010394.

"Bull trout have more specific habitat requirements than most other salmonids." 75 Fed. Reg. at 63,930. Specifically, bull trout require cold, clean water that is free from the impacts of sedimentation. 64 Fed. Reg. at 58,919–21. These strict habitat requirements "make bull trout particularly vulnerable to activities that warm spawning and rearing waters." *Id.* at 58,921. Sediment in bull trout streams can increase water temperature and damage bull trout habitat by

"reducing pool depth, altering substrate composition, reducing interstitial space, and causing braiding of channels, which reduce carrying capacity." *Id.* (internal citation omitted). Sedimentation also "negatively affects bull trout embryo survival and juvenile bull trout rearing." *Id.* "Chronic moderate turbidity can harm new-emerged salmonid fry, juveniles, and even adults by causing physiological stress that reduces feeding and growth, and increases basal metabolic requirements." FS009428. Turbidity can also impact fish vision and therefore interfere with social behavior. FS009429.

Because bull trout require specific conditions to live and spawn, "they are particularly susceptible to habitat loss, fragmentation, and degradation." *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 860 (D. Mont. 2021) *aff'd in part, vacated in part on other grounds, remanded sub nom. Swan View Coal. v. Steele*, 2023 WL 3918686 (9th Cir. June 9, 2023). Because "bull trout is largely a migratory species with complex migration patterns, connectivity among and within its habitats is essential for long-term persistence and recovery of the species." 75 Fed. Reg. at 63,960. It is "essential for the conservation of bull trout" to protect against "water quality impediments between spawning, rearing, overwintering, and freshwater and marine foraging habitats." *Id.* at 63,931. Consistently, the Forest Service has acknowledged that protecting bull trout and their habitat requires "closing and stabilizing or obliterating and stabilizing roads not needed for future

7

management activities," FS001318, and "regulat[ing] . . . traffic during wet periods to minimize erosion and sediment delivery," FS001317.

### III.     The Bitterroot National Forest and Amendment 40

The Bitterroot National Forest (the "Forest") encompasses approximately 1.6 million acres of Forest in Northern Idaho and West Central Montana. FS001081. It "consists of very rugged, mountainous terrain featuring outstanding natural beauty, clear mountain streams, and abundant and diverse wildlife." FS001081. The Forest is home to many species, including birds, small mammals, elk, bighorn sheep, moose, mountain goats, mountain sheep, deer, and bears. FS001082. It is also known for its riparian and aquatic resources, including mountain streams, high alpine lakes, and rivers. FS001082. The headwaters of the Bitterroot River in Montana and portions of the Selway and Salmon Rivers in Idaho fall within the Forest's boundaries. FS001081–82.

The Bitterroot National Forest's 1987 Forest Plan (the "Forest Plan" or the "1987 Forest Plan") and its amendments provide a framework for managing the Forest, including measures to protect species and habitat while providing for various uses. *See* FS000857. The Forest Plan is the primary source of "general resource management direction" for the Forest. FS001080. "The Forest Plan guides all natural resource management activities and establishes management standards" including "resource management practices, levels of resource production and

management, and the availability and suitability of land for resource management."
FS000857.

The 1987 Forest Plan included an elk habitat effectiveness plan, which limited the density of open roads in third-order drainages[2] to no more than one road mile per square mile or two road miles per square mile depending on the road densities that existed in 1987. FS010227–28. In September 2023, following a four-year NEPA process, the Forest Service approved Amendment 40 to the Forest Plan following the preparation of an environmental assessment "EA" and Finding of No Significant Impact ("FONSI"). FS010214–356. Relevant here, Amendment 40 eliminated the Forest Plan's elk habitat effectiveness standard, thereby eliminating limitations on open-road densities in third-order drainages. FS010377. That standard required the Forest Service to:

> Manage roads through the Travel Plan process to attain or maintain 50 percent or higher elk habitat effectiveness (Lyon 1983) in currently roaded third order drainages. Drainages where more than 25 percent of roads are in place are considered roaded. Maintain 60 percent or higher elk habitat effectiveness in drainages where less than 25 percent of the roads have been built.

---

[2] A "third-order" drainage is home to a third-order stream, which is "formed by the confluence of two or more second-order streams." FS000517. A second-order stream is "formed by the confluence of two or more first-order streams." FS000517. A first-order stream is an unbranched stream, meaning that it has no tributaries. FS000517.

FS10377. The Forest Service removed this standard because it: (1) constrained the agency's ability to undertake activities that would benefit elk; (2) was no longer based on the best available science for elk prosperity; and (3) was consistently being abrogated through project-specific amendments. FS010225–30.

As made clear throughout the record, the Forest Service also felt stymied by the elk habitat effective standard's road density limitation because it meant that if a specific project would not result in that standard being met within a drainage, those projects were either rejected or would require a project-specific amendment.  That was the case even if the project would maintain the existing road density or decrease the road density but not sufficiently to bring the drainage into compliance. The elk habitat effectiveness standard therefore posed a significant hurdle to site-specific activities that was exacerbated by the fact that most third-order drainages were noncompliant. Indeed, at the time the 1987 Forest Plan went into effect, 311 of the 385 third-order drainages were immediately out of compliance.  FS010228. And currently, 230 third-order drainages do not meet the standard. FS010228. This meant that the Forest Service could only approve activity in those drainages if the project reduced road density sufficiently to meet the elk habitat effectiveness standard.  As indicated by the numerous project-specific amendments related to this issue, *see* FS010226–27, the Forest Service regularly concluded that compliance was not feasible. Following the adoption of Amendment 40, "[n]o

standards exist that would limit the miles of routes that could be built in the future other than land designations that prohibit route construction by law, policy or rule." FS051514.

The Forest Service issued a draft EA for Amendment 40 in February 2023, FS009974–10085, a revised draft EA in April 2023, FS010086–213, and a final EA in September 2023, FS010214–356. The Final EA concluded that "the amendment itself does not create [adverse] effects" on grizzly bears. FS010331. Rather, impacts on grizzly bears would occur only from "the combined effects of the ongoing implementation of the Bitterroot Forest Plan, the Bitterroot Travel Plan, and the elk habitat components of [the A]mendment." FS010331. The Final EA does not mention bull trout at all. *See* FS010214–356. In response to public comment asking how Amendment 40 would impact bull trout, the Forest Service stated: "It won't." FS022738. Ultimately, the EA included a FONSI stating that Amendment 40 "will not have a significant effect on the human environment and . . . an environmental impact statement therefore will not be prepared." FS010330.

### A.   Grizzly Bears

As it relates to grizzly bears, the Forest Service issued a Biological Assessment ("BA") in 2020 that addressed the continued implementation of the 1987 Forest Plan, the Bitterroot Travel Plan, and Amendment 40. FS011693–738. The 2020 BA concluded that while the implementation of

11

the amended Forest Plan was "likely to adversely affect" grizzly bears, FS011694, Amendment 40 itself will not affect grizzly bears because "this amendment does not authorize or prohibit future route construction," FS011721. The Forest Service therefore initiated formal ESA consultation with the FWS regarding impacts on grizzly bears from continued implementation of the amended 1987 Forest Plan. FWS000189. On February 2, 2021, the FWS completed its initial Biological Opinion ("BiOp") for grizzly bears. FWS000189–247. The FWS concluded that the implementation of the amended 1987 Forest Plan would not jeopardize grizzly bears. FWS000230–33.  In connection with the Amendment, the Forest Service also prepared a Wildlife Effects Report ("2023 Wildlife Effects Report"), that concluded there would be no direct effects to grizzly bears and minimal indirect or cumulative effects.  FS011502–81.

On December 20, 2024, the Forest Service reinitiated consultation on the Amendment. FWS000188. On March 21, 2025, the Forest Service issued a Revised BA for grizzly bears, FS051481–533, again concluding that the amended 1987 Forest Plan would likely adversely affect grizzly bears, FS051482. The Forest Service subsequently reinitiated formal ESA consultation with the FWS, and the FWS issued a revised BiOp on April 24, 2025 ("Revised BiOp"). FWS000001–97. In that Revised BiOp, the FWS

12

concluded that the amended 1987 Forest Plan would not jeopardize grizzly bears provided that the Forest Service maintained minimum levels of secure grizzly bear habitat. FWS000078–81. The Revised BiOp defined "secure habitat" to include areas as small as one acre—or 0.0015 square miles—that are 500 meters or more away from the zone of influence around roads and motorized trails. FWS000013. The FWS concluded that Amendment's 40 elimination of prior limitations on open roads and motorized use would not jeopardize grizzly bears provided that the Forest Service does not permanently decrease secure habitat by more than one percent in any given grizzly bear management unit ("GBAU") or more than five percent in the action area as a whole. FWS000079–81. There are eleven GBAUs in the action area, each of which approximates an average annual female grizzly bear home range size. FWS000008. Additionally, the Revised BiOp permitted the Forest Service to exclude consideration of "impassable" roads when calculating secure habitat. FWS000073. "Impassable" roads are those closed with "permanent barriers," FWS000073, including earthen berms, FWS0000016. While the FWS conceded that it is "reasonable to assume that some future illegal" motorized trespass will occur on such roads, FWS000066, impacts from such use was dismissed as "unpredictable," "unknown," and "uncertain," FWS000020.

13

### B.    Bull Trout

As it relates to bull trout, in 1998, the FWS issued a Biological Opinion for the Effects to Bull Trout From Continued Implementation of Land and Resource Management Plans in Eastern Oregon and Washington, Idaho, Western Montana, and Portions of Nevada ("INFISH BiOp"). FS055360–480.

On March 15, 2023, the Forest Service issued a "fisheries" biological assessment ("BA") regarding impacts on several fish species, including bull trout, from continued implementation of Amendment 40. FS010394–96 ("March 2023 Fisheries BA"). The BA determined that there would be "no effect" on bull trout and bull trout critical habitat. FS010396. Accordingly, the Forest Service did not initiate formal consultation with FWS regarding impacts on bull trout. *See* FS010396 (stating that the BA "concludes [ESA] Section 7 consultation for bull trout"). In response to Plaintiffs' 60-day notice letter of their intent to sue, the Forest Service issued a Revised BA for bull trout on March 14, 2025. FS051473–80 ("March 2025 Bull Trout BA"). This BA again concluded that Amendment 40 would have no effect on bull trout. FS051479.

### LEGAL STANDARD

"Judicial review of agency decisions under NEPA, NFMA, and the ESA is governed by the Administrative Procedure Act ('APA'), which specifies that an agency action may be overturned only where it is found to be 'arbitrary, capricious,

14

an abuse of discretion, or otherwise not in accordance with law.'" *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. St. Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action likewise is arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id.* "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50. A court may not accept an agency's post hoc rationalizations for its action. *Id.* Where an agency's administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is appropriate. *See City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

## DISCUSSION

The crux of this case is whether the agencies adequately considered the impact Amendment 40—a programmatic elk standard amendment that eliminated

15

prior restrictions on road densities and motorized access—would have on grizzly bears and bull trout. Defendants maintain that the agencies did consider the impact of Amendment 40 because Amendment 40, on its own, does not propose or authorize any site-specific projects or road-related activities.  Plaintiffs disagree, insisting that the removal of road density limitations in third-order drainages necessarily has an impact on species adversely affected by road density and motorized use. As a threshold matter, Plaintiffs have standing to pursue the claims raised here. Defendants' other procedural challenges are considered in the context of the specific claims below. Ultimately, Plaintiffs succeed on all their ESA claims and the majority of their NEPA claims. Defendants, on the other hand, have shown that the records supports the Forest Service's decision not to prepare an EIS and the scope of its NFMA analysis. The appropriate remedy will be determined following further briefing.

## I.    Standing

Defendants assert that Plaintiffs lack Article III standing to challenge Amendment 40 because its programmatic nature means their alleged injuries are speculative. But the Ninth Circuit has recognized "standing to challenge programmatic management direction" even in the absence of a challenge to "an implementing project[.]" *Cottonwood Env't. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015). Indeed, project-specific analyses often rely upon

16

programmatic decisions and the baselines they set to determine project-specific requirements and to estimate projects' impacts on listed species or critical habitat. *See, e.g., Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994) (explaining that forest plans "have ongoing effects extending beyond their mere approval" because they set forth resource management criteria that may affect listed species or critical habitat). If, as Plaintiffs assert, Amendment 40 is fundamentally flawed in ways that could pose threats to grizzly bears and bull trout when future on-the-ground projects rely upon those flawed analyses, a challenge to Amendment 40 is appropriate.

Moreover, Plaintiffs' declarations detail their use of the Bitterroot National Forest, their desire to observe grizzly bears and bull trout, plans to visit the Forest in the future, and concerns that the Forest will be harmed by environmental degradation caused by roads and motorized use. (*See, e.g.*, Doc. 26-1 at ¶ 10; Doc. 26-2 at ¶ 16; Doc. 26-3 at ¶ 7; Doc. 26-4 at ¶ 5; Doc. 26-5 at ¶¶ 10, 12.) As the United States Supreme Court has long recognized, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992). Accordingly, Plaintiffs have standing to pursue the claims raised here.

## II.    ESA

The ESA is "the most comprehensive legislation for the preservation of

17

endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). As enacted, "[i]ts stated purposes were 'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved,' and 'to provide a program for the conservation of such . . . species.'" *Id.* (quoting 16 U.S.C. § 1531(b)). ESA Section 7 requires federal agencies to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat. 16 U.S.C. § 1536(a)(2). The agency proposing the action—here, the Forest Service—must consult with the FWS whenever an action "may affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. Where the action agency determines the proposed action will not affect a listed species or critical habitat, consultation is not required. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447–48 (9th Cir. 1996).

Where an action may affect listed species or critical habitat, the action agency may prepare a biological assessment to evaluate the potential effects of the proposed action on a listed species or critical habitat. 50 C.F.R. § 402.12. If, during informal consultation, the FWS concurs with the action agency that the proposed action is not likely to adversely affect listed species or critical habitat, no further action is necessary. *Id.* If the proposed action is likely to adversely affect a species

18

or critical habitat, then the action agency formally consults with the FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation results in the issuance of a biological opinion, including the FWS's conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat. 50 C.F.R. § 402.14(g). The FWS violates the ESA if it issues a biological opinion that "fails to consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgm't*, 698 F.3d 1101, 1121 (9th Cir. 2012) (alterations in original) (citation and internal quotation marks omitted). The Forest Service violates the ESA if it approves an action in reliance on a flawed biological opinion. *Id.* at 1127–28.

Plaintiffs argue that the FWS violated the ESA by issuing a Revised BiOp that failed to rationally examine Amendment 40's impacts on grizzly bears. More specifically, Plaintiffs argue that the FWS violated the ESA by approving a one-acre patch size for grizzly bear secure habitat and failing to rationally consider the impacts roads and motorized use have on grizzly bears both inside and outside of their secure habitat. Plaintiffs further argue that the Forest Service violated the ESA by relying on the Revised BiOp for grizzly bears and by failing to reinitiate formal consultation with the FWS regarding Amendment 40's impact on bull trout and bull trout critical habitat. As mentioned above, ESA claims are reviewed under

the APA standard, "[i]rrespective of whether an ESA claim is brought under the APA or the citizen-suit provision." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). Plaintiffs' claims are considered in turn.

### A. Grizzly Bears (Claim 1)

Plaintiffs are entitled to summary judgment as to all four of their ESA claims regarding the grizzly bear.

### 1. One-Acre Patches of Secure Habitat

Amendment 40 eliminated the 1987 Forest Plan's limitations on open-road densities. Plaintiffs argue that the Revised BiOp ignores best available science and fails to consider an important aspect of the problem when examining Amendment 40's potential to degrade grizzly bear secure habitat. The Court agrees.

In the Revised BiOp, the FWS used secure habitat to measure Amendment 40's impacts on grizzly bears. FWS000011. Secure habitat is defined as areas 500 meters from motorized roads or trails. FWS000012–13. The FWS concluded that the elimination of limitations on open road and motorized use will not jeopardize grizzly bears, so long as the Forest Service does not permanently decrease secure habitat more than one percent within any GBAU or more than five percent in the entire action area. FWS000079–81. But, in coming to this conclusion, the FWS permitted the Forest Service to include unroaded areas as small as one acre in size—or approximately .0015 square miles—as "secure habitat." FWS000201. The

20

Revised BiOp concludes that a one-acre patch size is appropriate because "no current research on grizzly bear habitat use exists for the Bitterroot Ecosystem or Bitterroot National Forest to inform if there is a minimum size patch of secure habitat that grizzly bears might use." FWS000013.

While the agency lacks data pertaining to minimum secure habitat patch size specific to the Bitterroot Ecosystem, the record is not entirely void of relevant data. Rather, as Plaintiffs put it, the "FWS disregarded decades of science regarding grizzly bear habitat needs because the research had not been conducted specifically in the Bitterroot National Forest." (Doc. 16 at 32.) For example, in the NCDE— which neighbors the Bitterroot Ecosystem—researchers found greater use in patches of secure habitat exceeding 2,500 acres in size. FWS000201. In the Canadian Rockies, researchers measured secure habitat in nine square kilometer patches, based on an adult female grizzly bear's daily foraging radius. FS036050. In the Selkirk and Cabinet-Yaak Ecosystems, researchers concluded that "if a minimum size occurs, it is likely between 2[] and 8 [square miles]," between 1,280 and 5,120 acres. FWS003941. This research suggests that grizzly bears consistently require secure patches thousands of acres in size.

The FWS must rely on the best available science when analyzing "the interplay between secure habitat and road density." *See, e.g.*, *All. for the Wild Rockies v. Gassmann*, 678 F. Supp. 3d 1249, 1283 (D. Mont. 2023); *Ctr. for*

21

*Biological Diversity v. U.S. Forest Serv. ("South Plateau")*, 811 F. Supp. 3d 1206, 1228 (D. Mont. 2025) ("In relying on a 10-acre patch size to define grizzly bear secure habitat in the absence of any scientific evidence showing that such acreage provides adequate habitat, the [FWS] failed to use the 'best available science' in violation of the ESA."). Here, the FWS did not articulate a rational conclusion for its deviation from the best available science; rather, the FWS attributed its departure to the fact that "no current research on grizzly bear habitat use exists for the Bitterroot Ecosystem or Bitterroot National Forest to inform if there is a minimum size patch of secure habitat that grizzly bears might use." FWS000013. But "insufficient evidence [is no] excuse for failing to comply with the [ESA]." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 801 F. Supp. 3d 1151, 1187 (D. Mont. 2025) (alteration in original) (quoting *Brower v. Evans*, 257 F.3d 1058, 1071 (9th Cir. 2001)).

Recently, this Court rejected a 10-acre patch size in the neighboring Greater Yellowstone Ecosystem, explaining that "[w]hile grizzly bears in different Ecosystems may have different habitat needs, the 10-acre patch size here remains untethered to any identified grizzly bear survival metric. Thus, even if Defendants are correct that 'any size' of secure habitat will do, that lends no specific support for a 10-acre patch size." *South Plateau*, 811 F. Supp. 3d at 1227. The same is true here. Defendants contend that "[w]ithout the benefit of local research, [the] FWS

22

exercised its expert judgment and concluded that one-acre patch sizes were appropriate for evaluating secure habitat in this action area." (Doc. 33 at 20 (citing FWS0000013).) The Revised BiOp asserts without citation to any scientific support that a one-acre patch size is "the most conservative" approach for identifying secure habitat. FWS000013. Defendants do not explain how the approach is "conservative" when it results in diminished habitat protection. And, like *South Plateau*, neither Defendants' assertions nor the administrative record provide scientific support for a 1-acre patch size. Nor were Defendants able to articulate at the motion hearing why a one-acre patch size is appropriate in the Bitterroot Ecosystem.[3]

Based on the foregoing, the FWS violated the ESA by using a one-acre patch size in its Revised BiOp in the absence of scientific support for that decision.

### 2.  Roads and Motorized Use in Secure Habitat

Next, Plaintiffs argue that because the Forest Service was permitted to exclude consideration of impassable roads when calculating secure habitat, the

---

[3] Notably, in its 2025 Revised BA, the Forest Service explicitly stated in reference to the one-acre patches: "*While these small blocks are likely not supporting grizzly bears on their own*, they can act as temporary refugia and steppingstones between larger blocks of secure habitat." FWS000151 (emphasis added). The Forest Service further explained that the insufficiency of the small patches may be offset by the fact that "secure habitat in the [Bitterroot National Forest] consists largely of blocks over 2500 acres in size." FWS000151. Instead of supporting the selection of a one-acre patch size, this reinforces the view that thousands of acres more accurately reflects grizzly bear habitat needs.

Revised BiOp fails to meaningfully consider impacts on grizzly bears from roads and motorized trespassing occurring within that secure habitat. Plaintiffs argue such exclusion is arbitrary because the Revised BiOp itself acknowledges that even unused roads can displace grizzly bears. Plaintiffs are correct for two reasons. First, the Revised BiOp acknowledges unused roads displace grizzly bears. FWS000032. As explained in *Swan View Coalition v. Haaland*, the FWS violates the ESA when it "fails to explain how the exclusion of 'impassable' roads from [road density] calculations . . . does not negatively impact [grizzly] bears," in light of the abundance of science demonstrating that grizzly bears avoid road and habitat surrounding roads where human use is "relatively low." 2024 WL 3219206, at *13 (D. Mont. June 28, 2024). Defendants argue that *Swan View* has no application here because *Swan View* involved a different recovery zone and the Court's application of another Forest Plan's impassable road standard. Meanwhile, here, there is no applicable impassable route standard, "and none should be engrafted onto the ESA's general consultation requirements." (Doc. 33 at 23.) The Court does not share Defendants' narrow reading of *Swan View* and *Swan View*'s reasoning is not confined to the Flathead National Forest.

Second, the Revised BiOp acknowledges that it "may be reasonable to assume that some future illegal use of the Forest via motorized access in areas not authorized for such use may occur in the action area." FWS000066. Nevertheless,

the Revised BiOp recites boilerplate assertions that impacts to bears are "uncertain" and "unknown." FWS000020. This Court has repeatedly rejected similar boilerplate explanations as insufficient under the ESA. *See, e.g.*, *Swan View*, 2024 WL 3219206, at \*11 ("This Court has squarely rejected the 'boilerplate' assertion that unauthorized motorized access is unpredictable and, therefore, its effects on grizzly bears are unknowable."). Such assertions are once again unavailing.

### 3. Roads and Motorized Use outside of Secure Habitat

Plaintiffs contend that the FWS also failed to consider impacts from roads and motorized access outside of secure habitat. In response, Defendants argue that the "FWS determined that secure habitat better captures how the configuration of roads can impact grizzly bears than linear route density." (Doc. 33 at 26.) Plaintiffs are once again correct. The Revised BiOp acknowledges "[b]oth road density and the proportion of secure habitat contribute[] different yet important components influencing [grizzly bear] survival." FWS000034. In other words, using secure habitat as the sole metric of road impacts on grizzly bears "ignores the interplay between secure habitat and road density . . . outside of secure habitat as predictors of grizzly bear survival." *Gassmann*, 678 F. Supp. 3d at 1283. Failing to analyze road density outside of secure habitat "ignores whether bears can safely move between pockets of secure habitat." *Id.* As Plaintiffs point out, ignoring the

25

increasing road densities outside of secure habitat is particularly concerning here, because the road densities in the Bitterroot National Forest already exceed those generally deemed acceptable for grizzly bears. As the Revised BiOp explains, open-road densities in the Forest average approximately 1.7 miles per square mile in the action area, and total road densities average approximately 2.2 miles per square mile. FWS000200. Meanwhile, bears use of habitat has decreased when "open motorized access density exceeded 1 mile per square mile," or "where total road densities exceed 2 miles per square mile." FWS000031. The Forest Service itself admits that post Amendment 40, "[n]o standards exist that would limit the miles of routes that could be built in the future other than land designations." FS051514. Amendment 40, therefore, has the potential to exacerbate already poor grizzly bear habitat conditions in the Forest.

### 4. Forest Service's Reliance on the Revised BiOp

Plaintiffs conclude that—based on the above deficiencies in the Revised BiOp—the Forest Service violated the ESA by arbitrarily relying on FWS's unlawful BiOp. (Doc. 28 at 32.) Plaintiffs are correct. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

### B. Bull Trout (Claim 2)

Plaintiffs argue that the Forest Service violated the ESA by failing to reinitiate formal consultation with the FWS about Amendment 40's impacts on

26

bull trout and bull trout critical habitat. Defendants counter that reinitiation would be duplicative because the INFISH BiOp evaluated the same Forest Plan, and future projects will include project-level consultation if they have potential to affect bull trout. Because Plaintiffs are correct, they are entitled to summary judgment on Claim 2.

The Forest Service violates the ESA if it fails to reinitiate formal consultation with the FWS when a forest plan is modified such that it affects a protected species in a manner not previously considered. *All. for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1205 (D. Mont. 2019) (citing 50 C.F.R. § 402.16). Here, rather than reinitiate formal consultation with the FWS, the Forest Service informed the FWS that no consultation was required because Amendment 40 "will not result in any direct, indirect, or cumulative effects on" bull trout or their habitat. FS051479. The Forest Service reached this conclusion despite the fact that, according to the FWS, "[i]ncreasing traffic levels on unpaved roads have been correlated with increased fine sediment delivery to stream channels." FS055518. Meanwhile, as the Forest Service explains, the threat of sedimentation caused by roads requires "closing and stabilizing or obliterating" roads, FS001318, and "regulation of traffic . . . to minimize erosion and sediment delivery." FS001317.

27

Defendants contend that because both the 2025 Bull Trout BA and the 1998 INFISH BiOp evaluate the same Forest Plan, their incorporation of the prior consultation document is "especially reasonable." (Doc. 32 at 28.) However, the INFISH BiOp did not contemplate Amendment 40's elimination of open-road densities and motorized access in third-order drainages within the Bitterroot National Forest.  And the 2025 Bull Trout BA merely relies on the INFISH standards to "avoid adverse effects to inland native fish." FS051478. By eliminating prior limitations on roads open to public motorized use, Amendment 40 will result in effects to bull trout not considered in the INFISH BiOp. Because reinitiation was required, the failure to do so violated the ESA.

Defendants argue that "future projects will involve project level consultation," and therefore, ESA consultation on Amendment 40 was not required. But "programmatic review . . . provides the only way to avoid piecemeal destruction of species and habitat." *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F. Supp. 3d 985, 993 (D. Mont. 2020) (citing *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005)); 50 C.F.R. § 402.14(c)). This argument is therefore rejected.

## III.   NEPA

NEPA is a procedural statute designed to foster informed decision-making by federal agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

28

348–49 (1989). While NEPA "does not mandate particular results," it "prescribes the necessary process for an agency's environmental review of a project." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 177 (2025) (internal quotation marks omitted). "Properly applied, NEPA helps agencies to make better decisions and to ensure good project management." *Id.* "NEPA does not require the agency to prioritize environmental concerns over other concerns in determining whether to proceed with a project; instead, all it requires is that the agency consider and disclose environmental impacts." *Cascadia Wildlands v. U.S. Bureau of Land Mgm't*, 153 F.4th 869, 880 (9th Cir. 2025) (citing *Seven Cnty.*, 605 U.S. at 180). It does, however, "require[] federal agencies to take a 'hard look' at the environmental consequences of their actions." *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 136 F.4th 816, 821 (9th Cir. 2025) (internal quotation marks omitted). To satisfy the "hard look" requirement, an agency must provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Forest plans must comply with NEPA. 16 U.S.C. § 1604(g)(1).

Plaintiffs argue that the Forest Service violated NEPA by failing to adequately examine Amendment 40's impacts on grizzly bears and bull trout and by issuing an arbitrary FONSI, i.e. not preparing an EIS. Defendants argue that

29

Plaintiffs waived or failed to exhaust their NEPA claims. On the merits, Defendants argue that the NEPA analysis is sufficient, including the decision not to prepare an EIS. Ultimately, Plaintiffs did not waive or fail to exhaust their NEPA claims and they succeed on the merits of these claims as they relate directly to grizzly bear and bull trout.  Defendants persuasively argue, however, that the Forest Service's decision to issue a FONSI instead of an EIS was not arbitrary or capricious on this record.

### A. Exhaustion and Waiver

Defendants first argue that Plaintiffs waived or failed to exhaust their NEPA claims. Not so. To avoid waiver, a plaintiff "must participate in the public comment process in such a way that it 'alerts the agency to the party's position and contentions in order to allow the agency to give the issue meaningful consideration.'" *All. for the Wild Rockies v. U.S. Forest Serv.*, 718 F. Supp. 3d 1292, 1300 (D. Idaho 2024) (quoting *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011)). To properly exhaust, a party must file a written objection under 36 C.F.R. § 218 which is "so similar [to the federal complaint] that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Buckingham v. Sec'y of U.S.D.A.*, 603 F.3d 1073, 1081 (9th Cir. 2010). Claimants are not required to use "magic words . . . in order to leave the courtroom door open

30

to a challenge." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002).

Here, as to their grizzly bear claim, Plaintiffs alerted the Forest Service that it "is obligated to consider how relaxing the road density standards would adversely affect this [t]hreatened species." FS012048–49. Plaintiffs asked the Forest Service to "[c]reate . . . a forest plan amendment to protect grizzly bears with road density restrictions and strict habitat protections." FS026259. Plaintiffs also provided the Forest Service with alternative methods for calculating secure core habitat within the Bitterroot National Forest. FS02291–92. Lastly, Plaintiffs urged the agency to "[u]se all available science to analyze grizzly core on the [Bitterroot National Forest]." FS026259. Based on these comments, Plaintiffs sufficiently alerted the Forest Service to Plaintiffs' NEPA grizzly bear claim. As for exhaustion, Plaintiffs submitted objections, including the warning that "[t]he Forest Plan's desired conditions for patches which includes a range of larger opening sizes may result in adverse effects if lack of cover leads to under use of foraging habitat or increased risk of human-grizzly bear conflicts causing mortality of a grizzly bear." FS026372.

Likewise, Plaintiffs sufficiently alerted the Forest Service to their concerns regarding the impacts of sedimentation on bull trout and bull trout critical habitat. Plaintiffs urged the agency to "analyze impacts on fisheries from higher sediment

yields." FS012047. Plaintiffs warned that "[e]rosion, compaction, and other alterations in forest geomorphology and hydrology associated with roads seriously impair water quality and aquatic species viability." FS022060. These comments were sufficient to put the agency on notice and give it an opportunity to meaningfully consider the issues. *See All. for the Wild Rockies*, 718 F. Supp. 3d at 1300. Plaintiffs also exhausted their NEPA claims for bull trout through their objections, by reiterating their call for "a careful analysis of the impacts to fisheries and water quality, including considerations of sedimentation, increases in peak flow, channel stability, risk of rain-on-snow events, and increases in stream water temperatures." FS026406. Plaintiffs further expressed that "[t]he Forest Service refused [to] analyze the effect of the amendments on water quality and bull trout" "in violation of NEPA." FS026407.

Plaintiffs did not waive or fail to exhaust their NEPA claims. Defendants suggest that each Plaintiff must submit comments on each legal claim. (*See* Doc. 33 at 16 n.3.) However, in the Ninth Circuit, a court "will consider any issue that was raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, whether the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 942 (9th Cir. 2020) (internal quotations and citation omitted). Plaintiffs' NEPA claims are therefore considered on the merits.

**B. Grizzly Bear (Claim 3)**

Plaintiffs argue that the Forest Service failed to take a "hard look" at Amendment 40's impact on grizzly bears by relying on the flawed secured habitat analysis discussed above and failing to acknowledge that Amendment 40's elimination of road density limitations directly impacts grizzly bears. Indeed, the Forest Service concluded that "[A]mendment [40] itself does not create [adverse] effects" on grizzly bears; rather, such impacts would occur only from "the combined effects of the ongoing implementation of the Bitterroot Forest Plan, the Bitterroot Travel Plan, and the elk habitat components of [Amendment 40]." FS010331. Defendants defend the agency's NEPA analysis on the basis that "the Bitterroot National Forest is currently unoccupied by grizzly bears . . . and Amendment 40 authorizes no road construction or motorized use." (Doc. 32 at 29–30.) Defendants further argue that recent project approvals show a trend towards less road density, not more. (*Id.* at 30 (citing FS_002030–52).) Finally, Defendants argue that the preparation of the 2020 BA, the 2023 Wildlife Effects Report, and the resulting summary analysis in the Final EA meets the "hard look" standard. Plaintiffs have the better argument.

"While reoccurring grizzly bear use does not occur in the action area at this time," multiple grizzly bears have been confirmed in the Bitterroot since 2007. FWS000009; FWS000140; FWS000147–48; FS049904; *see also* FS010272

33

(acknowledging that the FWS "considers that grizzly bear 'may be present' on some portions of the Forest"); FWS000145 (same). Montana Fish, Wildlife and Parks recognizes that "[o]f all remaining unoccupied grizzly bear habitat in the lower 48 states, [the Bitterroot Ecosystem] affords one of the best possibilities for grizzly bear recovery." FS035445. Defendants' attempt to justify the Forest Service's decision in light of the absence of grizzly bears therefore runs counter to the record.

Next, Defendants argue that the Forest Service's analysis is sufficient because there is an overall downward trend in open road density across the Forest. But even if specific projects positively impact road density, *see, e.g.*, FS002042 (decommissioning 39 miles of motorized routes as part of the Mud Creek Project), nothing in Amendment 40 mandates such positive results. To the contrary, Amendment 40 permits the approval of site-specific projects that could increase road density. That is the very problem. And the record shows potential road density increases going forward. According to 2020 BA, "there are approximately 51,441 acres (8%) of secure habitat . . . that could be affected by [future] route construction." FS011720. More specifically,

> The Forest estimates it may construct new motorized routes in the future (permanent or temporary), and that some of those routes may result in adverse effects to female grizzly bears. . . . The Forest anticipates no more than up to a 5% net reduction of secure habitat on Bitterroot National Forest lands in Montana . . . . While grizzly bears

34

do not currently occupy the action area, these indirect effects may adversely affect grizzly bears in the foreseeable future.

FS011718. Thus, the record anticipates some negative impacts. NEPA requires the Forest Service to consider both the good and the bad. By arguing that a positive "trend" in road density somehow obviates the second half of that obligation, Defendants ignore "an important aspect of the problem" and "offer an explanation for [a] decision that runs counter to the evidence." *State Farm*, 463 U.S. at 43.

Finally, Defendants argue that the information provided by the Forest Service in is 2020 BA, 2023 Wildlife Effects Report, and 2023 Final EA is simply sufficient. This argument is unpersuasive for two reasons. First, as discussed in the context of Plaintiffs' ESA claims above, the agencies' secure habitat analysis—and therefore secure habitat conclusions—lacks scientific support and omits important considerations, such as impassable roads. While the analysis required by NEPA differs from that under the ESA, the ESA-related flaws identified above undermine the NEPA decision documents that directly rely on them. Second, as made clear at the motion hearing, Amendment 40 directly impacts the Forest Service's ability to approve future projects. Indeed, following Amendment 40, "[n]o standards exist that would limit the miles of routes that could be built in the future other than land designations that prohibit route construction by law, policy or rule." FS011719. To use the example defense counsel raised during the hearing, Amendment 40 would permit the approval of a project in a currently noncompliant third-order drainage

35

that would otherwise not be permitted because it would not bring the drainage into compliance with the 1987 Forest Plan's road density requirements. Such projects are also very likely given that, according to the Final EA, at least 13 project-specific amendments have been used since 1990 to allow "third-order drainages in the project area to be managed at elk habitat effectiveness values less than the 50 percent standard." *See* FS010226–27. By failing to address Amendment 40's independent impacts on road density, and therefore secure habitat, the Forest Service "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and offered an explanation for its decision that runs counter to its own acknowledgment that "[t]he greatest limiting factor for grizzly bear suitable habitat is the distribution and scale of secure habitat for bear existence," FS011514; FS010273.

Defendants seek safe harbor in the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025). Therein, the Court reaffirmed that "NEPA does not require the agency to weigh environmental consequences in any particular way. Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relevant substantive environmental laws." *Id.* at 173. "Simply stated, NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.* But here, the

36

disconnect between a programmatic amendment that will remove road density limitations and a Final EA that does not reflect the impact such changes will have on grizzly bears prevents such informed decisionmaking. *See Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) ("NEPA requires consideration of the potential impact of an action *before* the action takes place." (internal quotation marks omitted)). Accordingly, the Forest Service has failed to meet its NEPA mandate as it relates to grizzly bears.

### C. Bull Trout (Claim 4)

Plaintiffs further argue that the Forest Service violated NEPA by "entirely failing to disclose and analyze Amendment 40's impacts on bull trout." (Doc. 28 at 37.) Indeed, the Final EA does not mention bull trout and when public comment raised the issue by asking how the Amendment would impact bull trout, the Forest Service stated, "[i]t won't." FS022738. Defendants argue that the Forest Service adequately considered bull trout because it was addressed in the March 2023 Fisheries BA, FS010394–96, and the March 2025 Bull Trout BA, FS051473–80. According to Defendants, "[i]t was reasonable for the Forest Service to conclude Amendment 40 would not impact bull trout since it does not authorize road building and includes components that would minimize future road building." (Doc. 32 at 32.) Plaintiffs are entitled to summary judgment on this claim.

As explained in the context of grizzly bears above, the record shows that while Amendment 40 does not directly approve any road building activities, it allows for more road building and open road density than is currently allowed under the 1987 Forest Plan. Because the record shows that road building and motorized routes cause sedimentation, which negatively impacts bull trout and bull trout habitat, *see* FS009428–30, it was arbitrary and capricious to not consider these "probable environmental consequences," *Ctr. for Biological Diversity*, 538 F.3d at 1194. And neither the 2023 Fisheries BA nor the 2025 Bull Trout BA cited by Defendants provides the necessary analysis. The Fisheries BA, for example, merely states that the "Forest Plan language change would not affect sediment." FS010395. While accurate, this statement is misleading because Amendment 40 directly affects future project approvals; i.e., it permits sediment-producing project activity that would otherwise be foreclosed by current open road density limitations. Similarly, the Bull Trout BA, a post-NEPA document, merely restates the position that Amendment 40 will have "no effect" on bull trout because it "does not authorize any specific actions." FS051479. Notably, the Forest Service has previously recognized that an "increase in sediment delivery to streams during and shortly after [road] maintenance activities," is a "primary concern," and that "[t]he location, design and overall condition (maintenance) of the established roads and associated road features directly influence the degree of impact roads have on

38

bull trout and bull trout habitat." FS009434. And it did so in the context of programmatic guidance that did not, by itself, authorize any road building or maintenance or alter open road density. *See* FS009400–76. Plaintiffs prevail on this claim.

### D. FONSI and Lack of EIS (Claim 5)

Finally, as it relates to NEPA, Plaintiffs argue that because the Final EA and FONSI failed to adequately consider the impacts on grizzly bear and bull trout as discussed above, the Forest Service was required to prepare an EIS. Defendants disagree. Ultimately, while Plaintiffs have prevailed on their grizzly bear- and bull trout-related NEPA claims, they have not shown that an EIS is mandated by law. *See* 42 U.S.C. § 4332(2)(C) (requiring an EIS for "actions significantly affecting" the environment). The conclusion that further consideration of grizzly bear and bull trout is necessary does not compel the conclusion that an EIS is required. Summary judgment is granted in Defendants' favor on this claim.

## IV.   NFMA (Claims 6 and 7)

NFMA sets forth "a two-stage approach to forest planning." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996). In the first stage, the Secretary of Agriculture must "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System[.]" 16 U.S.C. § 1604(a). Forest plans "guide sustainable, integrated

39

resource management" and promote forest lands that are "ecologically sustainable and contribute to social and economic sustainability" and that "consist of ecosystems and watersheds with ecological integrity and diverse plant and animal communities[.]" 36 C.F.R. § 219.1(b), (c). In the second stage, the forest plans are directly implemented as projects are proposed and assessed. *Inland Empire*, 88 F.3d at 757; *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1512 (9th Cir. 1992). Any proposed projects, permits, resource plans, or other instruments allowing use and occupancy of the forest lands must be consistent with the provisions of the governing forest plan. 16 U.S.C. § 1604(i); *Inland Empire*, 88 F.3d 754 at 757. "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan[.]" *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018). Courts give "substantial deference" to the "Forest Service's interpretation and implementation" of a forest plan. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). However, the Forest Service's failure to comply with a forest plan constitutes a violation of NFMA. *Id.*

### A.     Waiver, Exhaustion, and Ripeness

Defendants argue that Plaintiffs have waived and/or failed to exhaust their NFMA claims because referencing "connectivity" is insufficient to put the agency

40

on notice of a specific regulatory violation under NFMA. However, Plaintiffs' comments both specifically identified connectivity concerns, FS012049 ("[t]rue recovery . . . can only be achieved by enhancing [grizzly bear] connectivity"); FS012060 ("Natural migration of the grizzly essential to connectivity . . . would be incumbered by [Amendment 40]."); FS025884 (linking road culverts and connectivity needs of bull trout), FS025892 (same), and notified the Forest Service that it violated NFMA, FS022018–19 (specifically identifying the failure to comply with 36 C.F.R. § 219.8(a) plan components); FS022042 (same). These comments were sufficient to put the agency on notice and give it an opportunity to meaningfully consider the issues. *See All. for the Wild Rockies*, 718 F. Supp. 3d at 1300; *see also* FS022762 (Forest Service responding to a comment on connectivity with specific reference to "habitat and ecological connectivity" that would "be addressed during forest plan revision").

### B.    Ripeness

Defendants further argue that Plaintiffs' NFMA claims are not ripe because they do not challenge any site-specific actions. Indeed, while substantive challenges to forest plans are generally not ripe in the absence of site-specific action, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998), procedural challenges are ripe for review at the time the procedural violation occurred, *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1179 (9th Cir.

41

2011); *e.g.*, *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1084 (9th Cir. 2015) (holding the plaintiff's claim "ripe for review" because the plaintiff "does not argue for a particular substantive result but rather alleges that the Forest Service failed to comply with the procedural requirements of the ESA when it declined to reinitiate consultation."). Plaintiffs here are bringing procedural challenges to Amendment 40 under NFMA.  (*See* Doc. 16 at ¶¶ 90–99.) Their NFMA claims are therefore ripe for review.

### C.    Merits

Here, Plaintiffs argue that the Forest Service violated NFMA by failing to include forest plan components to maintain or restore connective grizzly bear and bull trout habitat in their approval of Amendment 40. Indeed, NFMA's implementing regulations require that a forest plan "include plan components . . . to maintain or restore structure, function, composition, and connectivity" of "terrestrial and aquatic ecosystems and watersheds in the plan area." 36 C.F.R. § 219.8(a)(1). But, as argued by Defendants, those same regulations give the agency the discretion to "[d]etermine which specific substantive requirement(s) within §[] 219.8 . . . are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment." 36 C.F.R. § 219.13(b)(5). Importantly, the agency "is not required to apply any substantive requirements within §[] 219.8 . . .

that are not directly related to the amendment." *Id.* That decision is "based on the purpose of the amendment and the effects (beneficial or adverse) of the amendment, and informed by the best available scientific information, scoping, effects analysis, monitoring data or other rationale." *Id.* § 219.13(b)(5)(i). If based on adverse effects, "a specific substantive requirement [of § 219.8] is directly related to the amendment when scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse effects associated with that requirement, or when the proposed amendment would substantially lessen protections for a specific resource or use." *Id.* § 219.13(b)(5)(ii)(A). The issuance of a FONSI creates a "rebuttable presumption that the amendment will not have substantial adverse effects." *Id.* § 219.13(b)(5)(ii)(B).

Here, Amendment 40 is targeted to align elk habitat, old growth, snag, and coarse woody debris objectives on the Forest. FS010220. As a result, its explicit purpose is not "directly related" to either grizzly bear or bull trout habitat connectivity. And because the Forest Service's NEPA effects analysis revealed no substantial adverse effects associated with § 219.8's connectivity requirement for either grizzly bear or bull trout, the failure to include the analysis was neither arbitrary nor capricious as it relates to the agency's NFMA obligations on this record. However, that conclusion may change after the agency reconsiders its NEPA analysis to address the shortcomings identified above.

43

## V.     Remedy

Plaintiffs request the Court declare unlawful and vacate Amendment 40, the Revised Biological Opinion, and the Final EA and remand to the agencies for further analysis. Defendants, for their part, ask the Court to remand the decision without vacatur. The APA directs that "[t]he reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Vacatur is the presumed remedy where an agency has acted unlawfully, *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018), but the district court "is not required to set aside every unlawful agency action," *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *see Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) ("A flawed rule need not be vacated."). "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys.*, 688 F.3d at 992 (internal quotation marks omitted). In assessing the seriousness of the error, courts "consider whether vacating a faulty [decision] could result in possible environmental harm." *Pollinator Stewardship Council v. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015). Another consideration is "whether the agency would likely be able to offer better reasoning or whether by complying with procedural

44

rules, it could adopt the same [decision] on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same [decision] would be adopted on remand." *Id.* Additionally, courts consider whether the errors are "limited in scope." *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019).

In light of the rulings made above, further briefing on this issue is required, specifically briefing that addresses the potential disruptive consequences of either vacatur or the failure to vacate.

**CONCLUSION**

Accordingly, IT IS ORDERED that the cross-motions for summary judgment (Docs. 26, 31) are GRANTED IN PART and DENIED IN PART. Summary judgment is GRANTED in favor of Plaintiffs as to Claims 1, 2, 3, and 4. Summary judgment is granted in favor of Defendants as to Claims 5, 6, and 7.

IT IS FURTHER ORDERED that within twenty-one (21) days of the date of this Order, the parties shall each file a brief not to exceed 2,500 words on the issue of remedy.

DATED this 9th day of June, 2026.

Dana L. Christensen, District Judge
United States District Court